**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG:DCW                                      *271 Cadman Plaza East, 4ᵗʰ Floor*
F.#2009R01834                                *Brooklyn, New York 11201*

                                             November 24, 2010

<u>BY HAND AND ECF</u>

The Honorable Eric N. Vitaliano
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

            Re:  United States v. Fernando Lahoz, <u>et. al.</u>
                 <u>Criminal Docket No. 09-0847 (ENV)</u>

Dear Judge Vitaliano:

            On or about December 15, 2009, an indictment was filed
charging Fernando Lahoz with (1) conspiracy to commit access
device fraud, in violation of 18 U.S.C. § 1029(b)(2); (2) access
device fraud, in violation of 18 U.S.C. § 1029(a)(1); and (3)
aggravated identity theft, in violation of 18 U.S.C.
§ 1028A(a)(1).  The charges against the defendant stem from his
involvement in manufacturing and using counterfeit credit cards
in or about and between June 2009 and August 2009 ("the charged
conduct").  Trial in this case is scheduled for December 6, 2010.

            The government respectfully seeks to introduce evidence
at trial concerning the defendant's prior uncharged involvement
in a counterfeit credit card scheme ("the uncharged credit card
fraud scheme").  First, the government seeks to introduce
statements the defendant made to law enforcement officers
concerning his involvement in the uncharged credit card fraud
scheme, which began in or about 2007.[1]  Second, the government
intends to introduce evidence from a witness ("Government Witness
1") who conspired with the defendant to engage in both the
uncharged credit card fraud scheme and the charged conduct.

            As detailed below, the evidence concerning the
uncharged credit card fraud scheme is admissible as direct
evidence of the charged conduct because it provides background to

---

            [1]    The defendant's statements are admissible as non-
hearsay admissions pursuant to Rule 801(d)(2)(A) of the Federal
Rules of Evidence.

the charged conduct and is inextricably intertwined with the
evidence of the charged conduct.  In the alternative, the
evidence is also admissible under Rule 404(b) of the Federal
Rules of Evidence.

BACKGROUND

I.   <u>Charged Conduct</u>

        At trial, the government anticipates that it will
present evidence demonstrating that in or about and between June
2009 and August 2009, the defendant and his co-conspirators
manufactured and used counterfeit credit cards.  In furtherance
of this scheme, the co-conspirators stole credit card account
information from real credit card holders through the use of a
small electronic instrument called a "skimmer device."  For
example, the co-conspirators provided a skimmer device to a
cashier at a retail store in lower Manhattan and paid the cashier
to use the device on their behalf.  The cashier then
surreptitiously swiped the credit cards of unsuspecting customers
through the skimmer device thereby capturing real customer credit
card account information in the memory of the skimmer device.
The co-conspirators later downloaded the stolen credit card
account information from the skimmer device onto their computer.

        To use the stolen credit card account information, the
co-conspirators purchased plastic cards from Hong Kong.  These
plastic cards looked similar to legitimate credit cards but were
not embossed (i.e., unlike real credit cards they did not bear
raised account numbers or account holder names) and unencrypted
(i.e., unlike legitimate credit cards, account information had
not been downloaded onto the magnetic strip).  The co-
conspirators next converted the cards into counterfeit credit
cards.  First, the co-conspirators used an "embosser" to etch
stolen account numbers and their own names onto the cards.  Next,
the co-conspirators used an "encoder" to code the stolen credit
card account information onto the magnetic strip of the cards.

        The co-conspirators then used the counterfeit credit
cards to conduct fraudulent transactions in the accounts of real
credit card holders.  For example, on multiple occasions between
June 2009 and August 2009, the defendant drove others, including
Government Witness 1, to various retail stores including Target
stores located in Brooklyn and Queens.  Upon arriving at the
stores, the defendant provided Government Witness 1 with
counterfeit credit cards and instructed Government Witness 1 to
purchase specific items with the credit cards.  Government
Witness 1 then used the cards as instructed and delivered both

-2-

the fraudulently purchased merchandise and the counterfeit credit cards to the defendant.  In return, the defendant paid Government Witness 1 for his role in the scheme.

II.   The Defendant's Statements

          On August 14, 2009, Special Agents with the United States Secret Service ("USSS") conducted an interview of the defendant.[2]  In the interview, the defendant admitted his role in both the charged conduct and uncharged credit card fraud scheme.

     A.   Charged Conduct

          The defendant admitted that approximately six months earlier, he purchased an embosser and an encoder for the purpose of manufacturing counterfeit credit cards.  The defendant also admitted that, in addition to purchasing the embosser and encoder, he purchased 150 fake counterfeit credit cards from an individual in Hong Kong.  Thereafter, the defendant obtained real credit card account information by both paying a retail store employee to capture customers' credit card account information using a skimmer device and purchasing account information from a source in Hong Kong.  The defendant admitted that he then manufactured counterfeit credit cards using the genuine account information that he had obtained.

          According to the defendant, he and others also purchased Target gift cards using counterfeit credit cards.  These Target gift cards were then used to purchase approximately $10,000 of merchandise, including a Sony Bravia television and a Sony PSP.

     B.   Uncharged Credit Card Fraud Scheme

          The defendant stated that in approximately 2007, while the defendant was working as a teller at a retail telephone store, an individual identified hereinafter as "John Doe" asked him if he wanted to earn extra money by helping John Doe with a credit card fraud scheme.  Thereafter, the defendant and John Doe began to manufacture and use counterfeit credit cards.

          According to the defendant, John Doe had "connects" for obtaining credit card information that had been stolen from other

_____

          [2]   Before interviewing the defendant, the USSS Special Agents advised the defendant of his Miranda rights, which he appeared to understand and waived both orally and in writing.

people.   Initially, third-parties manufactured the counterfeit credit cards on John Doe's behalf.   However, beginning in about 2007, the defendant and John Doe purchased equipment, including an embosser and an encoder, that allowed them to make their own counterfeit credit cards.   According to  the defendant, he contributed $3,000 towards the purchase price of this equipment.

After the defendant and John Doe received the embosser and encoder, John Doe taught the defendant how to use the equipment to make counterfeit credit cards.   The defendant stated that he and John Doe were "silent partners" in the credit card scheme and that his role was to make the counterfeit cards using the stolen account information provided to him by John Doe.

As part of the uncharged credit card fraud scheme, the defendant knowingly allowed John Doe to use counterfeit credit cards to buy merchandise at the retail store where the defendant worked ("Retail Store 1").   According to the defendant, John Doe paid him a flat fee for every fraudulent purchase he allowed John Doe to make at the store.

The defendant subsequently left his employment at Retail Store 1 because the company began to investigate his activities.   Thereafter, the defendant began to work at another retail telephone store in New York ("Retail Store 2").   While the defendant was working at Retail Store 2, John Doe again paid the defendant for allowing John Doe to buy merchandise at the store using counterfeit credit cards.   The defendant later left his employment at Retail Store 2 when his manager became suspicious of him.

According to the defendant, his relationship with John Doe ended when John Doe claimed that the police had raided his residence and seized the equipment that the defendant and John Doe had purchased to manufacture counterfeit credit cards.   The defendant did not believe that the police had seized the equipment from John Doe and thought instead that John Doe had stolen the equipment.   The defendant was also angry with John Doe because he owed the defendant $800 in connection with the uncharged credit card fraud scheme.

-4-

Additionally, the defendant provided a sworn affidavit in which he stated as follows:

> About a year and a half or two I met [John Doe] at a store.  He introduced me into the credit card scheme.  He asked me to provide the cash for merchandise that was needed to put together a credit card such as embosser and reader/writer.  Me and him parted and a year after about 6 months ago I got my own merchandise (embosser, reader/writer) and did my own thing.

## III. Anticipated Testimony of Government Witness 1

At trial, the government intends to elicit testimony from Government Witness 1, who conspired with the defendant to commit both the uncharged credit card fraud scheme and the charged conduct.  As to his knowledge of and role in the uncharged credit card fraud scheme, Government Witness 1 would testify that in 2007 or 2008, the defendant told him that he and John Doe were involved in a credit card fraud scheme, as part of which the defendant allowed others to use counterfeit credit cards to buy iPhones at a retail telephone store where the defendant worked.  Later, Government Witness 1 saw the defendant and John Doe in possession of an embosser, which the defendant told Government Witness 1 that he and John Doe had purchased to make counterfeit credit cards.

In addition, Government Witness 1 saw the defendant with gift cards that indicated a value of ten dollars. Government Witness 1 later learned from the defendant that, in fact, these gift cards were fraudulent and had been encrypted with stolen credit card account information.  As a result, the gift cards could be used to make purchases in excess of ten dollars.

The defendant subsequently recruited Government Witness 1 to participate in the uncharged credit card fraud scheme, which was nearly identical to that involving the charged conduct. Specifically, the defendant would drive Government Witness 1 to the retail store where the defendant worked.  Thereafter, the defendant would provide Government Witness 1 with counterfeit gift cards and instruct Government Witness 1 to use them to purchase iPhones at the retail store.  Thereafter, Government Witness 1 would give the stolen merchandise to the defendant, and the defendant would pay Government Witness 1 for using the counterfeit gift cards.

-5-

<u>DISCUSSION</u>

I.   <u>The Evidence Of The Defendant's Participation In The
     Uncharged Credit Card Fraud Scheme Is Inextricably
     Intertwined With The Evidence Regarding The Charged
     Conduct And Is Direct Evidence of the Charged Conduct</u>

   A.   <u>Legal Standard</u>

        It is well established that evidence of uncharged
criminal activity or bad acts is admissible independent of
Federal Rule of Evidence 404(b) where it constitutes direct
evidence of the crimes charged in the indictment.  <u>See</u>, <u>e.g.</u>,
<u>United States v. Carboni</u>, 204 F.3d 39, 44 (2d Cir. 2000); <u>United
States v. Thai</u>, 29 F.3d 785, 812 (2d Cir. 1994); <u>United States v.
Towne</u>, 870 F.2d 880, 886 (2d Cir. 1989).  In <u>Towne</u>, the Second
Circuit specifically identified three categories of uncharged
criminal activity that constitute direct evidence of the charged
offense.  870 F.2d at 886.  The Court stated:

          [e]vidence of uncharged criminal activity is not
          considered 'other crimes' evidence under Fed. R.
          Ev. 404(b) if it 'arose out of the same
          transaction or series of transactions as the
          charged offense, if it [is] inextricably
          intertwined with the evidence regarding the
          charged offense, or if it is necessary to complete
          the story of the crime [on] trial.'

<u>Id</u>. (quoting <u>United States v. Weeks</u>, 716 F.2d 830, 832 (11th Cir.
1983)).  Additionally, when the indictment contains a conspiracy
charge, uncharged acts may be admissible as direct evidence of
the conspiracy itself.  <u>See</u> <u>Thai</u>, 29 F.3d at 812.

   B.   <u>Argument</u>

        As set forth above, the defendant gradually acquired
the knowledge and skills he used to participate in the charged
conduct from his involvement in the uncharged credit card fraud
scheme.  For example, the defendant admitted that in or about
2007, he and John Doe acquired equipment to make counterfeit
credit cards.  Thus, through his participation in the uncharged
credit card fraud scheme, the defendant seemingly learned where
and how to purchase credit card making equipment such as an
embosser and encoder, and he used this knowledge to later buy his
own equipment in connection with the charged conduct.

-6-

Moreover, by his own admission, during the execution of the uncharged credit card fraud scheme, John Doe taught the defendant how to use this equipment and manufacture counterfeit credit cards.  This evidence thus explains how the defendant was later able to make his own counterfeit credit cards.  Additionally, the defendant's statements concerning the dispute and fall-out he had with John Doe explains his motivation for obtaining his own credit card making equipment.  All of this information is necessary to provide background information to the jury as to how and why the defendant ultimately manufactured his own counterfeit credit cards as charged in the indictment.  As such, the evidence of the defendant's prior production of and involvement with counterfeit credit cards is inextricably intertwined with the proof of the charged conduct and thus is admissible.  See United States v. Ojomo, 332 F.3d 485, 489 (7th Cir. 2003) ("Acts satisfy [the] inextricably intertwined doctrine if they 'complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime.'") (quoting United States v. Senffner, 280 F.3d 755, 764 (7th Cir. 2002)).

II. Evidence of the Defendants' Prior Uncharged
    Acts is Admissible under Rule 404(b)

Even if the Court finds that the above-described evidence is not admissible as direct evidence of the charged conduct, it is admissible under Rule 404(b) of the Federal Rules of Evidence.

A.  Legal Standard

Rule 404(b) provides, in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

Fed. R. Evid. 404(b).  The Second Circuit has adopted an inclusionary approach to evaluating Rule 404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate the defendant's "criminal propensity."  United States v. Garcia, 291 F.3d 127, 136 (2d Cir.

2002); see United States Pitre, 960 F.2d 1112, 1118 (2d Cir. 1992).  Such evidence is correctly admitted if (1) it is offered for a proper purpose, (2) it is relevant to a disputed trial issue, (3) its probative value substantially outweighs any possible prejudice, and (4) if requested, the trial court administers an appropriate limiting instruction.  See United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003).

     B.    The Proposed Evidence is Admissible Under
            Rule 404(b)

        Evidence concerning the defendant's prior uncharged credit card fraud scheme is admissible for several proper purposes under Rule 404(b).  First, the evidence provides background information to the jury about the relationship between the co-conspirators.  See United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (holding that the "evidence of [the defendant's] prior criminal conduct with his co-conspirators was relevant 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed'"); United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993) (holding that codefendants' relationship over a 14-year period, during which they stole property and committed narcotics crimes "was properly admitted [under Rule 404(b)] to explain how the illegal relationship between the two [defendants] had developed and to explain why [one defendant] . . . appointed [the other defendant] to a leading position in the Organization"); United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) (evidence of prior uncharged armed robberies admitted under Rule 404(b) to show the defendant's leadership role in relation to his co-conspirators); United States v. Mercado, 573 F.3d 138 (2d Cir. 2009) (evidence "showed the development of the relationship between [d]efendant and [co-conspirator] 'provid[ing] background for the events alleged in the indictment' and 'enabl[ing] the jury to understand the complete story of the crimes charged, or how the illegal relationship between coconspirators developed").  The relationship that developed between the defendant and Government Witness 1 during the period of the uncharged credit card fraud was crucial to the transactions that occurred during the charged conduct.  Indeed, in connection with both the charged conduct and the uncharged credit card fraud scheme, the defendant and Government Witness 1 engaged in nearly the exact pattern of behavior.  Namely, in connection with both the charged conduct and the uncharged credit card fraud scheme, the defendant: (1) invited Government Witness 1 to participate in the scheme; (2) drove Government Witness 1 to the retail store where the

-8-

fraud was perpetrated; (3) provided Government Witness 1 with the counterfeit cards; (4) instructed Government Witness 1 on how to use the counterfeit card; (5) took the fraudulently purchased merchandise from Government Witness 1; and (6) paid Government Witness 1 for using the counterfeit cards.  The evidence concerning this pattern of behavior will help explain to the jury the nature of the illegal relationship between the defendant and Government Witness 1.  Thus, the evidence of the uncharged transactions completes the story of the charged conduct and helps explain to the jury how the illegal relationship between the defendant and Government Witness 1 developed.  See Williams, 205 F.3d at 33-34.

In addition, evidence of the defendant's involvement in the uncharged credit card fraud scheme establishes his intent, knowledge and lack of mistake with respect to the charged conduct, including conspiracy.  When a defendant's intent and knowledge are put in issue, evidence of that defendant's involvement in illegal activity other than that charged is often admissible under Rule 404(b).  See, e.g., United States v. Martino, 759 F.2d 998, 1005-06 (2d Cir. 1984); United States v. Williams, 577 F.2d 188, 192 (2d Cir. 1978).

Lastly, the evidence that the defendant obtained and used an embosser and an encoder in connection with the uncharged credit card fraud scheme demonstrates the defendant's method and means of engaging in credit card fraud schemes, and therefore demonstrates the defendant's opportunity with respect to the charged conduct.

## Conclusion

For the reasons stated above, the government should be permitted to introduce the above-described evidence of the

defendant's involvement in the uncharged credit card fraud scheme at trial.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:   /s/_____
David C. Woll, Jr.
Una A. Dean
Assistant U.S. Attorneys
(718) 254-6241/6473

cc:  John S. Wallenstein, Esq. (via ECF)
     Clerk of Court (ENV) (via ECF)